**In re ENRON CORP., et al.,**
**Reorganized Debtors.**

**Upstream Energy Services, as Agent**
**for Certain Texas Gas Producers,**
**Appellant,**

**v.**

**Enron Corp., et al., The Official Committee of Unsecured Creditors of Enron Corp., et al., Appellees.**

**No. 04Civ.8883VM.**

United States District Court,
S.D. New York.

June 23, 2005.

Barry A. Brown, Houston, TX, for Upstream Energy Services.

Susheel Kirpalani, Matthew Scott Barr, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Official Committee of Unsecured Creditors of Enron Corp.

Brian Scott Rosen, Weil, Gotshal & Manges LLP(NYC), New York, NY, for Enron.

### DECISION AND ORDER

MARRERO, District Judge.

On November 9, 2004, Upstream Energy Services ("Upstream"), appearing as an agent for certain Texas gas producers ("Texas Producers"), appealed the Order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on July 15, 2004 (the "Confirmation Order") as a part of the Chapter 11 bankruptcy proceedings of appellees Enron Corp. and certain of its affiliated reorganized debtor entities (collectively, "Enron") confirming the Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief (the "Plan"). Enron filed a Motion to Dismiss Upstream's appeal as moot on January 19, 2005, which was joined by appellees The Official Committee of Unsecured Creditors of Enron Corp., et al. (collectively, the "Creditors' Committee") on January 20, 2005.

On May 20, 2005, the parties informed the Court that they agreed that the majority of issues raised by Upstream in its appeal were moot, and that the sole issue remaining in this action was the enforceability of the exculpation provision contained in Section 42.7 of the Plan (the "Exculpation Provision"). (Joint Letter from Weil, Gotshal & Manges LLP to the Court, dated May 20, 2005 ("May 20 Letter"), at 2.) Because the Court finds that Upstream's appeal as to this provision is also moot, the Court dismisses Upstream's appeal in its entirety.

### I. BACKGROUND

The Chapter 11 bankruptcy of Enron was one of the largest in history, and most of the facts of those proceedings are irrelevant to the appeal at hand. Therefore, only facts necessary for the resolution of the present dispute are recited herein.

### A. UPSTREAM'S CLAIM AGAINST

*ENRON* [1]

In October 2001, Upstream entered into a series of agreements with Enron North America Corp. ("ENA") for the delivery of natural gas to ENA in November 2001. *Upstream Security I*, 302 B.R. at 457. In entering these agreements, Upstream acted as an agent for the undisclosed and heretofore unidentified Texas Producers.[2] *Id.* at 461. ENA received the gas, but, by reason of its having filed for bankruptcy in December 2001, was unable to pay for the shipments when the obligations became due. Upstream filed a Proof of Claim in the ENA bankruptcy in July 2002 as an agent for the Texas Producers,[3] which Upstream claims were undisclosed principals that held title to the gas delivered under the October agreements. *Upstream Security II*, 312 B.R. at 29.

1. The details of Upstream's relationship with Enron are more fully described in the opinions rendered on the issue of whether Upstream's claim is secured or unsecured. *See In re Enron N. Am. Corp.*, 312 B.R. 27 (S.D.N.Y.2004) (*"Upstream Security II"*); *In re Enron Corp., et al.*, 302 B.R. 455 (Bankr. S.D.N.Y.2003) (*"Upstream Security I"*). Familiarity with these opinions is assumed.

2. Nowhere in the record presented to the Court on this appeal does Upstream list the Texas Producers for which it is acting as the agent. As noted in the Appellees' Reply Memorandum, Upstream has not revealed this information to the Bankruptcy Court either, as is required under Bankruptcy Rule 2019. (*See* Appellees' Reply Mem. of Law in Response to Upstream's Opp'n to Motion to Dismiss Appeal, dated March 9, 2005 ("Appellees' Reply Mem."), at 14 n. 10.)

3. Upstream's failure to submit the required disclosures under Bankruptcy Rule 2019 raises the question of whether these unidentified Texas Gas Producers in fact have consented to this agency relationship in relation to the bankruptcy. As stated in *In re Ionosphere Clubs, Inc.*,

> [t]o be an authorized agent of a multiple grouping, Bankruptcy Rule 2019 requires that every person purporting to represent

## B. ENRON'S CHAPTER 11 PROCEEDINGS

The Enron debtors, which at the time comprised approximately 180 affiliated debtor entities, each filed for Chapter 11 bankruptcy beginning on December 2, 2001 in the United States Bankruptcy Court for the Southern District of New York.[4] All of the affiliated debtor entities' Chapter 11 cases were consolidated for administrative purposes before Judge Arthur J. Gonzalez. (Findings of Fact and Conclusions of Law Confirming the Plan, dated July 15, 2004 (the "Findings Opinion" or "Findings Op.") at 7, included as Appendix Item 11 to Appellees' Mem.)

After approximately two years of negotiations between Enron, the Creditors' Committee and the ENA Examiner,[5] the nego-

> more than one creditor in a Chapter 11 reorganization case file a verified statement setting forth the names and addresses of the creditors, the nature and amount of the claims and the relevant facts and circumstances surrounding the employment of the "agent." ... Only when an agent has express authorization may he file a claim on behalf of another.

101 B.R. 844, 851–52 (Bankr.S.D.N.Y.1989) (internal quotation marks and citations omitted).

4. Not all of the Enron entities filed for bankruptcy on December 2, 2001. The individual filing dates for the various debtor entities are listed in the Notice of Occurrence of Effective Date and Deadline for the Filing of Claims for Administrative Expenses, which is included as Appendix Item 14 to Appellees' Memorandum of Law in Support of Motion to Dismiss Upstream's Appeal, dated January 19, 2005 ("Appellees' Mem.").

5. The Bankruptcy Court, *sua sponte*, ordered the appointment of the ENA Examiner on February 21, 2002 (*see* Order Directing Appointment of an Examiner in Enron North America Corp., dated February 21, 2002, included as Appendix Item 1 to Appellees' Mem.) after about ten different creditors moved in January and February 2002 for the

tiating parties agreed upon the Plan. (*Id.* at 39.) A total of ninety-nine objections to the Plan were filed by creditors. (*Id.* at 2–3.) Upstream filed several objections to the Plan, including an objection specifically concerning the Exculpation Provision. (*See id.* at 155–61.) The Bankruptcy Court permitted the objecting parties to collect discovery concerning the Plan, a process in which Upstream did not participate.[6] (*Id.* at 16–19; Decl. of Brian S. Rosen in Support of Appellees' Motion to Dismiss Upstream's Appeal ("Rosen Decl.") ¶ 8, attached as Ex. B to Appellees' Mem.)

The Plan was presented to the creditors for a vote, and all of the non-insider, impaired classes entitled to vote on the Plan voted in favor of accepting the Plan. (Findings Op. at 30.) The Bankruptcy Court subsequently held a nine-day confirmation hearing (the "Confirmation Hearing"), including the presentation of exhibits and witnesses for direct and cross-examination. The parties that had objected to the Plan failed to present any witnesses at the Hearing. (*Id.* at 2–5.) Upstream participated in the cross-examination of the debtors' proffered witnesses, including questioning on the subject of the Exculpation Provision. (*See, e.g.,* June 3, 2004 Confirmation Hearing Tr. ("Hearing Tr.") at 167–72, included as Appendix Item 17 to Appellees' Mem.)

On July 15, 2004, the Bankruptcy Court entered the Confirmation Order confirming the Plan, finding that it was fair and equitable and within the range of reasonable litigation outcomes, and disposed of all outstanding objections to the Plan, including those of Upstream. (*See* Confirmation Order at 2–3, included as Appendix Item 12 to Appellees' Mem.; Findings Op. at 109, 152–62.) The Plan became effective on November 17, 2004, and Enron emerged from Chapter 11 bankruptcy. (Rosen Decl. ¶ 11.) Since the issuance of this Order, both Upstream and Enron agree that the Plan has been substantially consummated. (*See* May 20 Letter at 1–2.) Upstream nonetheless argues that the Exculpation Provision should be struck from the Plan.

## C. *THE EXCULPATION PROVISION*

Section 42.7 of the Plan states, in pertinent part, that

> [n]one of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Employee Committee, the ENA Examiner ..., the Indenture Trustees, and any of their respective directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the for-

appointment of a trustee or examiner for ENA, appointment of a separate creditors' committee for ENA, or appointment of separate counsel for ENA. (*See* Disclosure Statement for Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code at 212, included as Appendix Item 4 to Appellees' Mem.) The ENA Examiner's role was expanded over the life of the bankruptcy proceedings and included, among other things, the duty to serve as a " 'facilitator of a chapter 11 plan in the ENA chapter 11 case,' " and as a "fiduciary protecting the interests of the ENA estate

and as a plan facilitator for ENA, working with the Debtors and the Creditors' Committee to facilitate the chapter 11 plan process for ENA and its subsidiaries". (Findings Op. at 10.) The ENA Examiner had a fiduciary duty solely to the ENA creditors. (*Id.* at 8.)

6. Because Upstream failed to file its objections to the Plan before March 3, 2004, Upstream did not have access to the electronic document depository established by the debtors. (Rosen Decl. ¶ 8.)

mulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein ...; *provided, however,* that the foregoing provisions of this Section 42.7 shall not affect the liability of ... any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct. ...

(Plan at 113–14, attached as Ex. A to the Confirmation Order, included as Appendix Item 12 to Appellees' Mem.)

Upstream did not participate in the discovery process preceding the Confirmation Hearing to ferret out potential claims that might be affected by the Exculpation Provision. (Rosen Decl. ¶ 8; *see* Findings Op. at 17 (noting that "[n]one of the Creditors that filed objections to confirmation of the Plan after March 3, 2004 sought discovery or requested reconsideration of the Confirmation Discovery Procedures Order.").) Although Upstream questioned at least one witness about the Provision, the examination consisted of a brief series of questions concerning the witness's knowledge of any causes of action that might lie against any of the exculpated Plan professionals. (*See* Hearing Tr. at 167–172.)

In the Bankruptcy Court's Findings Opinion, Judge Gonzalez addressed the Exculpation Provision. (*See* Findings Op. at 99–101, 145–46, 156.) The Court noted that Enron was unaware of any valid cause of action that would be waived as a result of this provision and that no party offered evidence of any claim, but also acknowledged that Enron never investigated whether there existed any causes of action that were released by this provision. (*See id.* at 99.) The Court stated that the

exculpation provision in the Plan [was] appropriately limited to a qualified immunity for acts of negligence and [did] not relieve any party of liability for gross negligence or willful misconduct. As a part of their key employee retention program, the [Bankruptcy] Court authorized ... the Debtors to provide indemnification to their officers and directors for their postpetition acts, as provided for under the Articles of Incorporation of the Debtors, the Oregon Business Corporation Act and other applicable law and consistent with the scope of the exculpation provision in Section 42.7 of the Plan.

(*Id.* at 100.) The Bankruptcy Court additionally found that the Exculpation Provision was "reasonable and customary and in the best interests of the estates," and that "without such exculpation, negotiation of a Plan in these Chapter 11 Cases would not have been possible." (*Id.* at 145–46; *see also id.* at 156 (overruling the objections of Upstream and others to the Exculpation Provision, stating that "the release and exculpation provisions contained in the Plan are in the best interests of the Debtors' estates and do not violate applicable bankruptcy and nonbankruptcy law").)

## II. DISCUSSION

■ Although Upstream was not required to obtain a stay of the Confirmation Order prior to appealing that order, its failure to obtain the stay exposed Upstream to the risk that "the appeal in question [would] be rendered moot by constitutional or related equitable/jurisprudential considerations." *In re Texaco, Inc.,* 92 B.R. 38, 45 (S.D.N.Y.1988). Upstream's failure to obtain a stay of the confirmation of the Plan has rendered the majority of its claims moot, as the parties stipulated to the Court in the May 20 Letter, and so the Court considers here

only whether to dismiss as moot Upstream's appeal as to the Exculpation Provision.

 Mootness doctrine has two aspects in the context of a bankruptcy appeal. First, there exists the Article III concern that the court consider only actual cases and controversies. *See* U.S. Const. art. III, § 2. As the Supreme Court stated in *Mills v. Green*,

> when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for [the appellate court], if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.

159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895); *see In re Texaco*, 92 B.R. at 45. Second, the court must consider whether, "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Best Prods. Co., Inc.,* 68 F.3d 26, 30 (2d Cir. 1995) (quoting *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir.1993) (*"Chateaugay I"*)). Where such inequity exists in the implementation of the remedy sought, the appeal is rendered moot. *Id.*

 In the context of a bankruptcy order that has been substantially consummated, "there fairly exists a 'strong presumption' that appellants' challenges have been rendered moot due to their inability or unwillingness to seek a stay.... [I]t is inherently improbable, once there has been 'substantial consummation,' that an appellate court will be able to fashion effective relief." *In re Texaco*, 92 B.R. at 46. "Substantial confirmation" is defined in the Bankruptcy Code as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

The Plan in this case has been substantially consummated, as defined in the Bankruptcy Code. All property proposed by the Plan to be transferred has been transferred and all equity interests in Enron proposed to be cancelled have been cancelled. (*See* Aff. of Robert S. Bingham in Support of Appellees' Motion to Dismiss Upstream's Appeal ("Bingham Aff.") ¶¶ 9(a), (d); Appellees' Mem. at 17.) The reorganized debtor entities have assumed control of substantially all of the property covered by the Plan. (Bingham Aff. ¶¶ 9(b), (d); Appellees' Mem. at 17.) Finally, distributions have been made in accordance with the plan, including a $16.1 million distribution to creditors in November 2004 and total distributions of approximately $570 million in February and April of 2005. (*See* Supplemental Aff. of Robert S. Bingham in Support of Appellees' Motion to Dismiss Upstream's Appeal ("Bingham Supp. Aff.") ¶ 4(a), included as an enclosure with Letter from Weil, Gotshal & Manges LLP to the Court, dated May 18, 2005.) In addition to these steps, myriad other complicated and interrelated transactions have gone forward, including the settlement and dismissal of litigation. (*See* Bingham Aff. ¶¶ 8(a)—(g), 9(e)—(j); Bingham Supp. Aff. ¶¶ 4(a)—(c).) Upstream does not contest that substantial consummation of the Plan has occurred. (*See* May 20 Letter at 1–2.) As a result of this substantial consummation, Upstream faces a "strong presumption" that its appeal in its entirety has been rendered moot. *See In re Texaco*, 92 B.R. at 46.

 Notwithstanding this presumption of mootness, "[c]onstitutional and equitable

considerations dictate that substantial consummation will not moot an appeal if *all* of the following circumstances exist:

 (a) the court can still order some effective relief . . .;

 (b) such relief will not affect the reemergence of the debtor as a revitalized corporate entity, . . .;

 (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court, . . .;

 (d) the parties who would be adversely effected by the modification have notice of the appeal and an opportunity to participate in the proceedings . . .; and

 (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

*In re Chateaugay Corp.*, 10 F.3d 944, 952–53 (2d Cir.1993) (*"Chateaugay II"*) (internal citations and quotation marks omitted, format altered, emphasis added). Because Upstream cannot establish all of these factors, its appeal must be dismissed as moot. *See In re Sunbeam Corp.*, Nos. 01–40291, 03 Civ. 536, 03 Civ. 924, 2004 WL 136941, at *2–*3 (S.D.N.Y. Jan.27, 2004).

 ■ While it might be possible for the Court to order some effective relief by removing the Exculpation Provision from the Plan, thus establishing the first *Chateaugay* factor, none of the other factors weigh in favor of granting Upstream such relief. The Exculpation Provision was negotiated by all parties, including the representatives of the creditors, the Creditors' Committee and the ENA Examiner, and was found by the Bankruptcy Court to have been necessary for the negotiation of the Plan and appropriate under the circumstances. (*See* Findings Op. at 100–101, 145–46.) Parties participated in the creation of the Plan under the guarantee that they would receive some limited protection for participating in one of the largest and most complex bankruptcy filings in history. (*See id.* at 145.) Key employees remained with Enron as a result of being promised some indemnification for their postpetition acts, an offer made by Enron with the Bankruptcy Court's approval. (*See id.* at 100.) To pull away this string would thus tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.

 Without such protection from liability, key personnel might abandon efforts to help the reorganized debtor entities follow through on the Plan and wind up its affairs. Without the participation of these individuals, the implementation of the Plan might falter, leading to an "unmanageable, uncontrollable situation for the Bankruptcy Court." *Chateaugay II*, 10 F.3d at 953. Additionally, all parties who would be adversely affected by the removal of the Exculpation Provision have not had an opportunity to be heard as to the effect such relief might have on them, thus the fourth *Chateaugay* factor has not been met.

 Finally, Upstream failed to diligently pursue a stay of the Confirmation Order, nor did it seek expedited review of its appeal from this Court. Upstream claims that it did not seek a stay of the Confirmation Order because its receipt of the stay might have been conditioned upon its putting up a bond for a large amount of money. (Upstream's Reply in Opp'n to Appellees' Motion to Dismiss, dated February 9, 2005 ("Upstream's Reply Mem."), at 3.) Upstream's meager assertion that it

"may" have had to post a bond and that it was "doubtful" that it could have obtained a satisfactory bond does not change the weight of the equities. As the Fourth Circuit stated in *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*,

> We can understand a reluctance to put up a supersedeas bond of $ 7 million, but if the Pension Fund seriously sought an outright reversal of the order of confirmation, as it contends, it should have posted the bond or sought a substantial reduction in its amount; it should not have sat idly by while this case drifted along a routine, unexpedited course.

841 F.2d 92, 95 (4th Cir.1988).

Upstream's reliance on the Third Circuit's opinion in *In re Continental Airlines*, 203 F.3d 203 (3d Cir.2000), is misplaced. (*See* Upstream's Reply Mem. at 13–14.) In that case, the appellants were shareholders who had brought several securities fraud class actions against the directors and officers of Continental Airlines Holdings, Inc. Their class actions had been stayed pending Continental's bankruptcy, but were subsequently permanently enjoined as a part of the reorganization plan, which effectively released the debtors' directors and officers, the debtors, and others from all claims accruing at any time through until the confirmation date. *Id.* at 205–07. The shareholders received no consideration for the forcible forfeiture of their claims. *Id.* at 211.

This situation is distinguishable from that presented by Upstream to this Court. First, the scope of the Exculpation Provision is far more limited, exculpating only negligent conduct and only such conduct occurring after the filing of Enron's bankruptcy petition and relating to the creation of the Plan. Second, Upstream does not have a pending action against the exculpated parties for negligence in the creation of

the Plan that has been dismissed by the Exculpation Provision, nor does Upstream present this Court with any evidence that it will ever have such a claim. It does not appear likely that any such claim exists given the Bankruptcy Court's finding that the exculpated Plan professionals acting in their capacity as such "provided valuable services to the Debtors' estates in satisfaction of their ... fiduciary duties." (Findings Op. at 101.) Additionally, the Bankruptcy Court considered the objections of Upstream and others concerning the Exculpation Provision and dismissed those objections, finding that the Provision was "reasonable and customary and in the best interests of the estates," in conformity with applicable law and necessary for the negotiation of the Plan. (*Id.* at 100–01, 145–46, 156.) Finally, Upstream received some indirect consideration for the Exculpation Provision in that the Bankruptcy Court found that the negotiated Plan would not have been possible without it, and that without a negotiated Plan, "the value of these chapter 11 estates would be immeasurably depleted by costly and lengthy litigation, thereby injuring all creditors." (*Id.* at 145.) Judge Gonzalez, who oversaw every aspect of Enron's reorganization and who was integrally involved in the bankruptcy for approximately three years, was certainly in the best position to rule on the necessity and efficacy of such a provision.

Upstream cannot sustain its appeal in light of the substantial consummation of the Plan as it has not met all of the factors articulated in *Chateaugay II*. Moreover, the Court finds that it would be manifestly inequitable at this late stage to modify even this one provision of the Plan that so many parties have relied upon in making various, potentially irrevocable, decisions. The Court finds that the entirety of Upstream's appeal has been rendered equita-

bly moot by the substantial confirmation of the Plan.

## III. *ORDER*

For the foregoing reasons, its is hereby

**ORDERED** that Upstream Energy Services's appeal of the Bankruptcy Court's Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief, entered on July 15, 2004, is dismissed.

The Clerk of Court is directed to close this case.

**SO ORDERED.**